# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS E. HILL, | 1:09cv01307 DLB |
| Plaintiff, | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

## BACKGROUND

Plaintiff Chris E. Hill ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed his application on June 8, 2006, alleging disability since March 31, 2006, due to herniated disc in lower back, fused discs in neck, nausea, vomiting, vertigo and asthma. AR 111-17, 147. After Plaintiff's application was denied initially and on reconsideration, he

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

requested a hearing before an Administrative Law Judge ("ALJ"). AR 75-78, 82-86, 87. On August 29, 2008, ALJ Michael J. Haubner held a hearing. AR 20-62. He denied benefits on November 17, 2008. AR 6-16. The Appeals Council denied review on May 27, 2009. AR 1-3.

Hearing Testimony

ALJ Haubner held a hearing in Fresno, California, on August 29, 2008. Plaintiff appeared with his attorney, Rosemary Abarca.[2] Vocational expert ("VE") Judith Najarian also appeared and testified. AR 22.

Plaintiff testified that he was born in 1946. AR 29. He graduated from high school and has a bachelor's degree in criminal justice. He has a medical retirement for back injuries and a regular retirement. He was a full-time peace officer with the Kern County Sheriff's Department, was injured, and retired. The other retirement is from the Kern County District Attorney's Office Special Investigation Unit. AR 30.

Plaintiff has a driver's license with no restrictions. He drives an automatic car and has an automatic truck. On average, he drives two times a day. AR 30-31.

Plaintiff lives in a house with his wife, a 15-year-old son and a 24-year-old son. His wife does not work. She is disabled, but not receiving any benefits. She is physically ill. His sons are not on disability. The 15-year-old is in school. The 24-year-old just got out of the Army and started college. AR 31-32.

Plaintiff is able to care for his personal needs most of the time. He sometimes needs help putting on his shoes and pants. In the last six months, he needed help about 10 days. It is typical, in a six-month period, that he needs help about 10 times. AR 32-34.

Plaintiff testified that he does a little bit of yard work. He mows the lawn two or three times a month. He does not weed or water. He walks behind the mower, which is self-propelled. He does not make the bed or change the sheets. He takes out the trash once every three or four days. He does not sweep or vacuum. He does not clean the kitchen or the bathrooms. He talks on the phone every other day. He does not cook. He prepares simple meals once a week. He

---

[2]The transcript identifies Plaintiff's counsel as "Rosemary Merka," but documents in the record identify her as "Rosemary Abarca." AR 79-80.

2

does not clean up after himself or do dishes. He does not mop or dust. He does not do laundry or grocery shopping. He shops for non-grocery items about twice a month. He goes to church or a place of worship three times a month. He does not go to any of his son's school functions. He does not help with homework. His hobby is "ESPN." He watches TV every day for an average of two and a half hours. He reads the paper every morning for 15 minutes. He does not exercise on a regular basis. AR 34-37.

Plaintiff testified that his back condition has stayed the same. He is not fully compliant with his treatment and medications. He misses some of the medications. AR 38. He was on a home exercise program, but did not do it. AR 38-39.

Plaintiff wears glasses when he is driving and reading. There is no restriction on his driver's license. The glasses correct his vision to 20/20. AR 39.

Plaintiff testified that he has Meniere's disease. Dr. Bush told him that about two years ago. AR 40-41.

Plaintiff can carry about 40 pounds. He has difficulty bending or stooping. He avoids it. He did not think he could bend or stoop two hours out of eight. He can stand 10 to 15 minutes at one time before he has to sit down and rest. He can sit about 10 to 15 minutes at one time before he would have to get up. He can walk one or two blocks before he has to rest. He has to elevate his feet or lie down for about two hours total in an eight hour day. AR 41-43.

The VE responded to questions from the ALJ. The VE testified that Plaintiff's past relevant work as a District Attorney investigator combined two classifications. Putting the two classifications together, it was medium, skilled, SVP seven. Lifting 50 pounds was consistent with the combined classification. AR 45-46.

In regard to Plaintiff's past work as an ag inspector, the VE testified that there was a classification of inspector/grader, ag, in the DOT as medium. It is a seasonal job and is unskilled with a two. Lifting of 50 pounds was consistent with the medium classification. AR 46.

The VE testified that Plaintiff would have gained skills in his past relevant work, including knowledge of how to locate and appropriately interview people, gather facts and document them, verbal and written communication skills, being observant, examining data,

knowledge of how to do background checks, serving papers, knowledge of arrest procedures and weapon use and safety. AR 47. Plaintiff had to maintain handgun proficiency in the DA investigative job and had to qualify three times a year. The VE testified that this was consistent and there was transferability to other jobs. AR 47-48.

The ALJ asked the VE to assume for each hypothetical a person of the same age, education and work background as Plaintiff. For the first hypothetical, based on the August 2006 consultative examination, the ALJ asked the VE to assume a person who could stand and walk at least six hours out of eight and could sit eight hours out of eight. This person did not need an assistive device. This person could lift and carry 50 pounds occasionally, 25 pounds frequently. This person did not have limitations on bending, stooping, crouching, handling, feeling, grasping or fingering and frequently could do them. This person was limited to occasional overhead reaching. This person did not have any visual, communicative or environmental limitations. The VE testified that this person could do Plaintiff's past relevant work as an investigator and an ag inspector. AR 48-49.

In the alternative, the VE testified that there would be other work that this person could do with little or no vocational readjustment. One example would be a processor, which happens to be light, semiskilled. After reduction, there would be 5,467 jobs in California and about nine times that in the United States. Another example where transferable skills would be used, is an alarm investigator or shopping investigator, which are light and semiskilled. There are 4,894 jobs in California and nine times that in the United States. A third example using transferable skill would be a gate guard, like in security, which is light and semiskilled. There is no reduction. There are other titles in this category that also fit, such as a merchant patroller or airline security. There are 71,917 jobs in California and nine times that in the United States. AR 49-50.

For the second hypothetical, based on the residual functional capacity assessment of August 2008, the ALJ asked the VE to assume a person who could lift and carry 50 pounds occasionally, 25 pounds frequently, could stand and/or walk about six hours out of eight and could sit about six hours out of eight with normal breaks. This person had unlimited ability to

push and pull. This person frequently could climb ramps and stairs, but never ladders, ropes or scaffolds. This person frequently could balance, stoop, kneel and crouch and occasionally could crawl. This person had limited ability to reach and should avoid overhead work. This person had limited near/far acuity and depth perception, resulting in the avoidance of fine detailed work, constant close work and the need for precision and depth perception. This person also should avoid concentrated exposure to heights and should avoid heights, moving machinery and situations of jeopardy due to intermittent vertigo. The VE testified that this person could not perform Plaintiff's past work as a DA investigator or an ag inspector. AR 50-51.

This person could perform other work, such as the process server with the same numbers. This person also could do the alarm/shopping investigator work with the same numbers. This person could be a gate guard, but some of the other titles would have to be reduced. There were six titles in the classification and only two of the six fit the hypothetical, which is a one-third reduction. There would be 23,972 jobs in California with about nine times that in the US. AR 52-53.

For the third hypothetical, the ALJ asked to VE to assume the same person as in hypothetical two, but without the vision limits. The VE testified that this person could not perform Plaintiff's past relevant work. As for other work, this person could perform the same jobs identified in hypothetical two. Without the visual limitation, the numbers would be the same as for hypothetical one. AR 53-54.

For the fourth hypothetical, based on the August 2006 consultative psychological examination, the ALJ asked the VE to assume a person who is able to understand, carry out and remember simple instructions. This person would be able to respond appropriately to coworkers, supervisors, and the public. This person would be able to respond in usual work situation and could deal with routine work settings. This person had some difficulty with social functioning and had some difficulty with concentration, persistence and pace. The VE testified that "some difficulty" is too nebulous to answer. AR 54-55.

For the fifth hypothetical, based on Plaintiff's testimony, the ALJ asked the VE to assume a person who could lift and carry 40 pounds. This person avoided all bending or stooping at the

5

waist. This person could sit for 10 to 15 minutes at a time, could walk one to two blocks at a time, could stand 10 or 15 minutes at a time and needed to elevate his feet two hours out of eight. The VE testified that the person could not do Plaintiff's past relevant or any other work. The world of work is closed for such a person. AR 55.

In response to additional questions from the ALJ, Plaintiff testified that he has pain in his low back and neck. The low back pain is there all the time. He would rate it at 5 out of 10. His neck pain is constant as to the fusion. He would rate it at 3 ½ out of 10. AR 56-57.

In response to questions from his attorney, Plaintiff testified that he takes medications for control of the back and neck pain. He takes Vicodin, Soma and Motrin. He has side effects from his medications. His medications make him sleepy a couple hours a day. He constantly gets nausea. When he takes his medications, he does limited driving. He drives at least two times a day. He generally goes one mile. AR 57-59.

Plaintiff testified that he stopped the home exercise program after one try because of the pain. Plaintiff has a hearing problem in both ears, but it is not real bad. It is possibly related to the vertigo. AR 59.

Plaintiff testified that he stopped working March 31, 2006, due to pain, nausea and vomiting. Plaintiff did not think it was very possible to transfer his skills to other work when taking Vicodin every day. He did not feel that he could complete an eight-hour a day, five-day-a-week workweek due to the nausea and the pain killers. AR 59-60.

Medical Record[3]

On June 6, 2006, Plaintiff saw John McGrath, FNP, for vertigo, with symptoms of nausea and vomiting. FNP McGrath noted that Plaintiff has had positional vertigo for years. AR 310. He was prescribed Antivert and received a Phenergan injection. AR 311.

On June 12, 2006, Plaintiff saw his treating physician, John T. Young, M.D., for follow-up on his vertigo, nausea and vomiting. Plaintiff reported that the vertigo began a week earlier and it was aggravated by a change in position. He described the severity as moderate and

---

[3] Plaintiff's sole argument is related to evidence of peripheral neuropathy in February 2007 and the summary of the record is therefore limited accordingly.

improving, but did not feel that the Antivert helped. Dr. Young assessed Plaintiff with benign positional vertigo and prescribed Phenergan for nausea. AR 309.

On August 11, 2006, R. Alexan-Shirabad, M.D., completed a neurological consultation of Plaintiff's reports of vertigo, nausea and vomiting. AR 346. Following a neurological examination, Dr. Alexan-Shirabad assessed Plaintiff with peripheral vestibulopathy. He opined that the differential diagnosis included benign positional peripheral vertigo, which was the most probable diagnosis, and Meniere's disease. AR 347. Plaintiff had absent ankle jerks, most probably due to his lumbar spine disorder. AR 346. Dr. Alexan-Shirabad indicated that besides medication such as Phenergan for nausea, he did not have any other medication recommendation. Although he suggested physical therapy for vestibular rehabilitation, Plaintiff refused, claiming that he had this treatment before and it made him worse. AR 346. Dr. Alexan-Shirabad planned to perform a MRI of the brain to rule out any central nervous system legion. AR 346.

On August 12, 2006, Sarupinder Bhangoo, M.D., completed an internal medicine consultative examination. Plaintiff complained of upper and lower back pain for 25 years. Plaintiff reported pain in the neck area since undergoing fusion of cervical disks in 1989 or 1990. He rated the pain as 5/10 to 10/10 radiating to the shoulder. He also reported 20% loss of left hand use, decreased sensation in three fingers and numbness down to both hands. He reported similar pains in his lower back area, radiating to the left testicle and down to the left leg. He rated the pain as 5/10 to 10/10. Plaintiff stated that he has a hard time bending and lifting. Plaintiff had a six year history of nausea, vomiting and vertigo, but the cause was unclear. He indicated that it starts in the morning, lasts an hour, he throws up and after that he is fine. AR 324-25.

As to activities of daily living, Plaintiff stated that he was able to do his personal care, move around, do some household work and go to church. He also stated that he drives, he has a camper and goes to the beach, he watches a lot of television and he goes to movies. As to current medications, Plaintiff reported taking Promethazine very rarely, along with aspirin and Nexium. AR 325.

On physical examination, Plaintiff moved around well and did not have any problem getting in and out of the chair or climbing on the examination table. He was bending from his back during activities and did not seem to have any limitations. He also seemed to be moving his neck in a normal fashion. His gait was nonantalgic. He was able to do tiptoe and heel walking. Dr. Bhangoo conducted range of motion testing. Plaintiff had normal bulk and muscle tone and no noted problems with grip strength. His sensory exam was normal. AR 325-27.

Based on his examination, Dr. Banghoo diagnosed Plaintiff with status post cervical spine fusion, lumbar disk disease and benign positional vertigo. Dr. Banghoo opined that Plaintiff had somewhat limited mobility of the neck, but did not have any pain. Plaintiff gave a history of low back pain with some radiation to the left leg, but Dr. Bhangoo noted no specific sensory or motor deficits. Plaintiff was bending from his back without any difficulty. Dr. Bhangoo noted that Plaintiff was able to drive and able to take camping trips, "all suggestive that the claimant is quite an active male" who retired from work with no specific changes in his condition. AR 326-27.

Dr. Bhangoo opined the Plaintiff could stand and walk at least six hours in an eight-hour workday. He could sit eight hours in an eight-hour workday. He could lift and carry 50 pounds occasionally, 25 pounds frequently. He did not have any limitations on handling, feeling, grasping or fingering and could do them frequently. He might have difficulty in reaching overhead and might be somewhat limited to occasional. He did not have any relevant visual, communicative or workplace environmental limitations. Dr. Bhangoo rated Plaintiff's maximal functional capacity as "at least medium with overhead reaching limited to some degree." Dr. Bhangoo further opined that Plaintiff's benign vertigo did not seem to contribute anything to his disability. AR 327-28.

On August 30, 2006, state agency physician John Bonner, M.D., completed a Physical Residual Functional Capacity Assessment form. Dr. Bonner opined that Plaintiff could lift and/or carry 50 pounds occasionally, 25 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about six hours in an 8-hour workday and could push and/or pull without limitation. AR 438. Plaintiff could climb ramps and stairs frequently, but

could never climb a ladder, rope or scaffolds. He frequently could balance, stoop, kneel and crouch, but only occasionally crawl. Due to his benign positional vertigo, he should avoid heights and undue head and neck movements. AR 440. He should avoid overhead work, but had unlimited handling, fingering and feeling. His visual near acuity, far acuity and depth perception were limited. He had to avoid fine detail, constant close work and need for precise depth perception. His visual accommodation, color vision and field of vision was without limitation. AR 441. He had no communicative limitations. He also should avoid heights, open machinery and situations of jeopardy due to his intermittent vertigo. AR 442. On February 22, 2007, state agency physician George Bugg, M.D., reviewed Plaintiff's medical records and affirmed Dr. Bonner's assessment.[4] AR 445.

On October 18, 2006, Plaintiff again saw FNP McGrath for complaints of moderate, intermittent vertigo. AR 455.

On January 8, 2007, Dr. Marshall S. Lewis conducted a comprehensive orthopedic evaluation of Plaintiff's lumbar spine. Dr. Lewis had physician assistant, James Jones, complete the dictation. Plaintiff reported that his chief complaint was low back pain. The pain sometimes went down his left leg to his toes with numbness and tingling. AR 362. Plaintiff said he was retired. AR 415. When asked about his activities of daily living, Plaintiff stated that on a regular day he can stand up to an hour and sit up to an hour. He sometimes "can only walk about 20 minutes to an hour depending how he feels." AR 412-13.

On examination, Plaintiff was able to stand erect without listing or splinting. He was unable/unwilling to flex forward beyond 40 degrees. He indicated that these activities caused his back to go out and he was unwilling to do it. Straight leg raising was negative and Plaintiff was able to extend the legs supine to 85 degrees without accentuated back pain. He could extend both knees to 180 degrees while sitting on the exam table without apparent difficulty. He stood on toes and heels without difficulty. His reflexes were 2+ and symmetrical. He squatted without deviation. There were no identifiable paresthesias. He felt hot, cold and pinwheel equally in the

---

[4] The Commissioner indicates that Dr. Bugg reviewed Dr. Bonner's assessment on May 1, 2007. However, the record is unclear if Dr. Bugg reviewed the assessment after February 22, 2007. AR 445.

lower extremities. There was no visible atrophy. Plaintiff had normal appearing lumbar radiographs. AR 417-18.

Dr. Lewis assessed Plaintiff with low back pain with prior injuries, left lower extremity lumbar radiculopathy by history, lumbar facet arthropathy, lumbar spine spondylolisthesis, L5-S1 disc protrusion of 3 mm, L5-S1 mild left foraminal stenosis, hyperemia/gouty arthritis, and a cervical spine surgery/fusion. AR 418-19. Dr. Lewis noted that Plaintiff had been declared permanent and stationary/maximum medical improvement as of June 4, 2004. AR 419. Dr. Lewis recommended a lower extremity nerve conduction test and a repeat lumbar spine MRI. Additionally, Dr Lewis felt "there is a true question about this patient's ability to function." He recommended that Plaintiff have "a B-200, which is a diagnostic study performed by physical therapy that determines the patient's veracity of statements by taking range of motion under stress to find out if he [is] prevaricating in his response to lack of range of motion or whether this is a truly identifiable physiological problem that may need further intervention." AR 421.

On February 6, 2007, Plaintiff saw PA Jones. On examination, Plaintiff was in acute distress with difficulty standing erect and difficulty going from the sitting to standing position. He flexed forward only 15 degrees. Straight leg raising was negative while sitting in the exam chair. AR 358.

On February 9, 2007, Plaintiff saw PA Jones and reported that he was doing fine on his medications. Plaintiff remained symptomatic for low back pain and lower extremity radiculopathy. He was to continue on current medications, including Lorcet, ibuprofen and Soma. AR 350-351.

On February 14, 2007, Stephen J. Helvie, M.D., completed a consultative neurology examination. Nerve conduction studies showed evidence of a "definite peripheral neuropathy." Motor conduction velocity in the peroneal nerves bilaterally was markedly slow for Plaintiff's age. There was distal neurogenic change noted involving the intrinsic muscles of the left foot. An EMG showed no evidence of acute or chronic lumbar radiculopathy in the musculature of the left lower extremity and low back. AR 438.

On March 8, 2007, Plaintiff saw PA Jones for follow-up and test results. PA Jones indicated that a February 14, 2007, B-200 back test included the following results: "'May suggest submaximal effort. Test indicates that patient may have given a managed submaximal effort.'" Treatment records also reflected the findings of Dr. Helvie regarding Plaintiff's peripheral neuropathy. AR 493. On physical examination, Plaintiff moved about the exam room freely. Straight leg raising was negative. Plaintiff extended both knees to 180 degrees while sitting on the exam table. Plaintiff was able to hold the extensor hallucis longus in a contracted dorsiflexed position with no evidence of gross weakness. Plaintiff was given a copy of the nerve conduction study/EMG, which was to be taken to his primary care physician to determine if the peripheral neuropathy had some relationship to his other medical conditions. AR 493-94.

On August 7, 2007, Plaintiff saw PA Jones for exacerbation of his pain. AR 486.

On September 13, 2007, Plaintiff saw PA Jones for his lumbar spine. On physical examination, he moved freely about the exam room and had no apparent difficulty going from a sitting to standing position. PA Jones opined that Plaintiff's left foot pain complaints were most likely related to peripheral neuropathy because there were no radicular findings on straight leg raising or on nerve conduction study. AR 480. Plaintiff was prescribed Lorcet, ibuprofen and Soma. He declined intervention from a pain management specialist. AR 481.

On November 8, 2007, Plaintiff saw PA Jones and reported that he had been doing reasonably well and had cut back on his medications. He did not need refills. His low back pain wain was "well controlled with conservative care" and he was to continue on a home exercise program. AR 472-73.

On February 7, 2008, Plaintiff again saw PA Jones. He reported doing somewhat better and did not need pain management. He moved freely about the exam room, but had difficulty going from a sitting to a standing position. He was able to perform sitting straight leg raising with no apparent difficulty. He was to continue on his current medications. AR 465-66.

On May 16, 2008, Plaintiff saw PA Jones for his lumbar spine. Plaintiff was not in acute distress and moved freely about the exam room. He had some difficulty going from a sitting to a standing position. He was to continue on prescribed medications. AR 458-59.

ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through December 31, 2011. Plaintiff had not engaged in substantial gainful activity since March 31, 2006. The ALJ determined that Plaintiff had the severe impairments of lumbar degenerative disease, benign positional vertigo, status post cervical fusion and Meniere's disease. AR 11. Despite these impairments, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to lift/carry 50 pounds occasionally, 25 pounds frequently, and stand, walk and sit 6 hours in an 8-hour workday. He could occasionally crawl, but could never climb ladders, ropes or scaffolds. He also should avoid overhead work, working at heights, working with open machinery or working in hazardous situations. AR 12. The ALJ determined that Plaintiff could not perform any past relevant work, but he had acquired work skills that were transferable to other jobs existing in significant numbers in the national economy. AR 15.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See *Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(g). Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an impairment or a combination of impairments that is considered "severe" (lumbar degenerative disease, benign positional vertigo, status post cervical fusion and Meniere's disease) based on the requirements in the Regulations (20 CFR §§ 404.1520(c)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; but (5) can perform a significant number of jobs in the national economy. AR 11-16.

Here, Plaintiff argues that the ALJ (1) failed to properly evaluate the medical evidence; and (2) failed to properly evaluate his credibility.

## DISCUSSION

A.   Evaluation of Medical Evidence

Plaintiff contends that the ALJ erred by ignoring his February 2007 diagnosis of peripheral neuropathy. An ALJ is not required to discuss every piece of evidence in the record. Rather, the ALJ must explain why significant probative evidence has been rejected. *Vincent v.*

*Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984). Defendants contend that the diagnosis of neuropathy was neither significant nor probative. The Court agrees.

Here, the ALJ found that Plaintiff could lift and carry 50 pounds occasionally, 25 pounds frequently, could sit, stand and walk 6 hours in an 8-hour day, could occasionally crawl, could never climb ropes, ladders or scaffolds, and should avoid overhead work, working at heights, with open machinery, or in hazardous situations. AR 12. The ALJ based this RFC finding on Dr. Bhangoo's consultative examination and the state agency medical consultant. Specifically, the ALJ indicated that both Dr. Bhangoo and the state agency consultant "put the claimant at restricted medium." The ALJ noted that Dr. Bhangoo did not include ladder or hazard limitations, which did not seem consistent with Plaintiff's history of benign positional vertigo. As such, the ALJ adopted the state agency limitations (with the exception of vision limitations). AR 15.

Plaintiff first appears to challenge the ALJ's reliance on Dr. Bhangoo's opinion, arguing that Dr. Bhangoo did not have an opportunity to review the test results showing peripheral neuropathy before considering Plaintiff's functional limitations. Plaintiff points out that Dr. Bhangoo examined Plaintiff on August 12, 2006, which predated the nerve conduction/EMG tests by six months. While Plaintiff correctly notes the timing of the tests, Dr. Bhangoo expressly considered Plaintiff's claims of pain radiating to his left leg, but found "no specific sensory or motor deficits." AR 327. Dr. Bhangoo conducted range of motion and motor strength testing. Plaintiff's gait was nonantalgic, he was able to do tiptoe and heel walking, he had normal bulk and tone and a normal sensory exam. AR 326-27. Given the examination findings, there is nothing to suggest that Dr. Bhangoo's assessed functional limitations would differ based on a subsequent neuropathy diagnosis. In other words, a review of the nerve conduction studies would not have changed the results of Dr. Bhangoo's objective testing and observations of Plaintiff during the examination.

Plaintiff does not identify any functional limitations attributable to the peripheral neuropathy. At the hearing, Plaintiff did not claim any pain in his lower left extremity. AR 56.

He also proffers no medical opinion contradicting Dr. Bhangoo's findings. Mere reference to a diagnosis is not sufficient. *See, e.g., Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of disability).

As there was no opinion from a treating source, Dr. Bhangoo's opinion, as a consultative physician, may serve as substantial evidence. This is particularly true where, as here, it is based on the examiner's independent findings and observations. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989). Moreover, Dr. Bhangoo's limitations were not inconsistent with any objective findings or limitations identified on examinations conducted by PA Jones of Dr. Lewis' office. AR 458-59, 465-66, 480. For example, in November 2007, after the neuropathy diagnosis, Plaintiff reported cutting back on his medications. As the ALJ noted (AR 13-14), Plaintiff's low back pain was found to be "well controlled with conservative care." AR 472-73. The need for conservative treatment suggests a lower level of pain and functional limitation. *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995).

Plaintiff's suggestion that the ALJ incorrectly evaluated Dr. Bhangoo's opinion by stating in his discussion that the EMG of his left lower extremity "was normal" is not persuasive. Opening Brief, p. 10; AR 14. The record supports the ALJ's determination and reflects that the EMG of the musculature of Plaintiff's left lower extremity showed no evidence of acute or chronic lumbar radiculopathy. AR 438.

Plaintiff next challenges the ALJ's reliance on the opinions of the state agency physicians, arguing that their opinions are not substantial evidence because they had no idea that he suffered from peripheral neuropathy. Opening Brief, p. 11. In this instance, at least one state agency physician, Dr. Bugg, reviewed Plaintiff's medical records after the February 14, 2007, nerve conduction study. AR 445. Although it is unclear from the record whether Dr. Bugg in fact reviewed the results of Plaintiff's nerve conduction study, the opinions of the state agency physicians were generally consistent with the opinion of Dr. Bhangoo, which was based on independent clinical findings. Accordingly, their opinions may constitute substantial evidence. *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (opinions of non-treating or

non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record).

B.     Plaintiff's Credibility

Plaintiff next contends that the ALJ's failure to consider his peripheral neuropathy had an impact on the credibility analysis. Specifically, Plaintiff argues that the improper identification of "the baseline" of his medically determinable impairments resulted in a "tainted" evaluation of his testimony. Opening Brief, p. 12. However, this is not a situation in which the ALJ failed to determine that Plaintiff had any medically determinable physical impairments that could reasonably be expected to produce the alleged symptoms. Instead, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible. AR 13; Social Security Ruling 96-7p (when there is a medically determinable physical impairment that could be expected to produce the symptoms, the ALJ must evaluate the limiting effects of the symptoms and make a finding about the credibility of the individual's statements).

In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*
>
> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel,* 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

Here, the ALJ's credibility analysis was not directed merely by the lack of objective medical evidence, which would implicate Plaintiff's laboratory findings of peripheral neuropathy. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) (ALJ may not discredit claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence). In this case, the ALJ made other findings in support of the credibility determination.

The ALJ first noted that there was a medical entry of "possible *suboptimal effort* at his physical therapy." AR 14 (emphasis in original). An ALJ may properly consider the failure to give maximum effort during evaluation when assessing credibility. *See* Thomas, 278 F.3d at 959 (failure to give maximum effort during physical capacity evaluations may support adverse credibility determination). The record reflects that Plaintiff may have given "managed submaximal effort" on B-200 testing. AR 493. The purpose of B-200 testing was to determine the veracity of Plaintiff's statements. AR 421. As such, the ALJ's consideration of Plaintiff's effort was valid.

Next, the ALJ pointed to Plaintiff's admitted non-compliance with his medications and with his exercise program. AR 14. An ALJ may properly consider a claimant's inadequately explained failure to follow a prescribed course of treatment. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (claimant's failure to seek or follow prescribed treatment is a proper basis for finding allegations of disabling pain and other symptoms not credible); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (ALJ's credibility determination may include consideration of claimant's unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment).

The ALJ further contrasted Plaintiff's activities with the alleged severity of his impairments. The ALJ explained that Plaintiff drives twice a day, mows his lawn 2 or 3 times a month, prepares simple meals once a week, takes out the trash every 3 or 4 days, shops twice a month and goes to church three times a month. AR 13. The ALJ also noted Plaintiff's admission to Dr. Bhangoo that he is able to perform most activities of daily living after his alleged morning bouts of vertigo, nausea and vomiting subside and that he is able to take

camping trips. AR 14. The ALJ correctly indicated that such activities were not consistent with his claim of disability.[5] *Smolen*, 80 F.3d at 1284 (ALJ may consider claimant's daily activities in assessing whether claimant's testimony is credible).

Finally, the ALJ noted that Plaintiff seemed to exaggerate. He pointed out that although Plaintiff testified that he could only sit 10 to 15 minutes maximum, he was able to sit through the entire hearing (over 1 hour). AR 14. This is a valid consideration. *See Drouin v. Sullivan,* 966 F.2d 1255, 1258-59 (9th Cir. 1992) (ALJ's observations during the hearing, along with other evidence, constitutes substantial evidence). Moreover, an ALJ may use "ordinary techniques" in addressing credibility. *Smolen*, 80 F.3d at1284 (ALJ may consider "ordinary techniques" of credibility evaluation such as testimony that "appears less than candid").

Plaintiff has not argued that these credibility findings are unsupported or are in error. The Court finds that the ALJ's credibility analysis is supported by substantial evidence and is free of legal error.

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Chris E. Hill.

IT IS SO ORDERED.

Dated: **July 13, 2010**        **/s/ Dennis L. Beck**
                                            UNITED STATES MAGISTRATE JUDGE

---

[5]Even if such activities are not sufficient to discredit his testimony, the credibility analysis remains valid. *Batson v. Barnhart*, 359 F.3d 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one reason may have been in error).